IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ESTRELLA TENORIO,

       Plaintiff,

v.                                              1:15-cv-00349-LF-JHR

SAN MIGUEL COUNTY DETENTION CENTER,
BOARD OF COMMISSIONERS OF SAN
MIGUEL COUNTY, WARDEN PATRICK
SNEDEKER, in his Individual and official
capacities, ANTONIO PADILLA, ELFIGO
SANDOVAL, JOEY ROMERO, and MATHEW
BORREGO, in their individual capacities,
HEALTH CARE PARTNERS FOUNDATION,
INC., and RITA TORRES, in her individual and
official capacities,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on plaintiff Estrella Tenorio's Partial Motion for Summary Judgment against Defendants Sandoval, Romero, and Borrego for Violations of Plaintiff's Fourth Amendment Rights and for Torts under the New Mexico Tort Claims Act (Doc. 217). Also before the Court is defendants San Miguel County Detention Center ("SMCDC"), Board of Commissioners of San Miguel County, SMCDC Warden Patrick Snedeker, and SMCDC Correctional Officer Antonio Padilla's (collectively "County Defendants") Motion for Summary Judgment on Qualified Immunity and Other Grounds (Doc. 231). Both motions are opposed. *See* Docs. 236, 249. For the following reasons, the Court DENIES plaintiff's motion, and GRANTS the County Defendants' motion.

# I.  **Statement of Facts**[1]

Health Care Partners Foundation ("HCP") had a contract with San Miguel County to provide medical services to inmates and detainees at SMCDC.  Ms. Tenorio applied to work at SMCDC as a medical officer in 2013, at the end of her first year of nursing school.  She picked up the application at SMCDC and ultimately was hired.  She submitted her application to an employee of HCP, but she interviewed with Warden Snedeker, in his office, while an HCP employee was present.  Warden Snedeker sent Ms. Tenorio's application to the human resources supervisor for the San Miguel County Human Resources Division, stating that Ms. Tenorio was the prospective individual to be hired through HCP for the position at SMCDC.

When she was hired, the CEO of HCP told Ms. Tenorio there would be traveling opportunities.  The plan was to fully train Ms. Tenorio at SMCDC, then transfer her to other facilities as needed.  Ms. Tenorio signed an independent medical contract agreement with HCP, but in 2015, the Department of Labor informed HCP that it should have treated Ms. Tenorio as a W-2 employee rather than a 1099 independent contractor.  Ms. Tenorio became aware that HCP was a contractor for San Miguel County once she started working for HCP.  Ms. Tenorio worked for HCP on an "as needed basis."

Ms. Tenorio's on-site, day-to-day supervisor at SMCDC was employed by HCP and was an HCP supervisor.  Ms. Tenorio received her daily assigned tasks from an HCP employee.  Ms. Tenorio submitted all her payroll time sheets to HCP, not to SMCDC or the County.  She did not receive any benefits from either HCP or the County.  HCP provided Ms. Tenorio all her medical training except for a CPR First Aid training, which was provided by an SMCDC employee.

---

[1] This statement of facts mostly contains undisputed facts, but there are points at which the evidence is conflicting, which I have attempted highlight as necessary.  The specific material facts on which this opinion is based—whether disputed or not—are discussed in more detail in relation to each motion.

SMCDC also provided security training to Ms. Tenorio.

Ms. Tenorio was working at SMCDC the night of May 12, 2013. Defendants Elfigo Sandoval, Joey Romero, and Matthew Borrego (referred to collectively as the "Detention Officer Defendants") were employed as SMCDC correctional officers and also were on duty that night. Each of the Detention Officer Defendants was carrying handcuffs. Officer Sandoval also was carrying pepper spray with him, which he had used earlier that evening on an inmate in Ms. Tenorio's presence. Aside from the Detention Officer Defendants, there were only two other detention officers on the premises of SMCDC that night.

At about 9:00 or 10:00 p.m., Ms. Tenorio entered the master control room. The master control room is about 12 feet by 12 feet, and individuals entering the room must go through multiple sets of doors, all of which are controlled by a detention officer in the master control room. The lights in the master control room typically are off, and it is hard to see into the room. The lights were off on May 12, 2013, when Ms. Tenorio entered the room. However, the doors to the room were open.

Officer Romero was in the control room when Ms. Tenorio entered. He and Ms. Tenorio started talking, and eventually the conversation turned to the question of whether Officer Romero could "cuff" Ms. Tenorio. According to Officer Romero, Ms. Tenorio asked him to try to cuff her several times, and he refused. But she kept egging him on, and eventually he tried to cuff her. At first they struggled, and he was unsuccessful, but eventually he was able to cuff her to a chair. While she was cuffed to the chair, she went out of the master control room, into the hallway, rolling the chair with her. At some point, she also was cuffed to a toilet located in the master control room. According to Officer Romero, Ms. Tenorio was laughing during the entire encounter. Officers Sandoval and Borrego, who entered the control room later, similarly

testified that Ms. Tenorio was taunting the officers, telling them that they were not strong enough to cuff her, and that when they eventually tried to cuff her, it was "horseplay." All three Detention Officer Defendants testified that Ms. Tenorio was laughing during all or most of the encounter, as well as after the encounter.

Ms. Tenorio recounted the events very differently. She testified that Officer Romero pulled out his cuffs and started cuffing her for no apparent reason. She denied laughing or challenging him to cuff her. She testified that she told him to stop it, and Officer "Borrego tried to jump in and help him." Doc. 236-1 at 5. A little later Officer Sandoval also came in, and he also handcuffed her. *Id.* at 7–8. Ms. Tenorio could not remember whether she laughed or smiled during the interaction, but she admitted that she did not cry. She could not remember whether any of the officers were laughing or smiling.

Warden Snedeker testified that he first became aware of the handcuffing incident about a month later, when Rita Torres, the CEO of HCP, called him and told him that a horseplay incident had occurred. On June 6, 2013, Warden Snedeker directed Major Antonio Padilla to conduct an investigation. Ms. Tenorio testified that she tried to minimize the incident to everyone she spoke to because she did not want anything bad to happen to the Detention Officer Defendants. On June 10, 2013, Major Padilla completed his investigation. As a result of the investigation, Warden Snedeker suspended Officers Romero, Borrego, and Sandoval without pay for five days. These officers were acting contrary to their training when they handcuffed Ms. Tenorio, and the County took the use of handcuffs seriously. Ms. Tenorio was not formally disciplined by either HCP or SMCDC as a result of the incident. She was, however, taken off the SMCDC schedule, and she last worked there on July 8, 2013. She continued to work for HCP until July 26, 2013.

There is no video surveillance of the master control room itself, but there was video surveillance and recording of the hallway outside the master control room. Both Officer Romero and Ms. Tenorio knew this. Major Padilla testified that he checked the video surveillance system to see if there was a video of the incident, but that it didn't exist. Both he and Warden Snedeker testified that they never saw any video of the incident. On the other hand, Amanda Martinez,[2] the HCP employee who supervised Ms. Tenorio, told Ms. Tenorio that she watched the video with Warden Snedeker and Major Padilla about a month after the incident, in June 2013. Doc. 231-2 at 29–30. According to Ms. Tenorio, Ms. Martinez said that the video showed Ms. Tenorio "eventually roll out into the hall cuffed to a chair." *Id.* at 29. Ms. Tenorio herself, however, never saw a video of the incident. Warden Snedeker testified that the preservation capacity of the video camera in May and June 2013 was four to six weeks, and if it had not been taped over until six weeks after the incident, it would have existed when Major Padilla's investigation began. Major Padilla testified that the video camera only retained footage for seven to fourteen days before it was taped over. Ms. Tenorio's counsel sent a letter requesting a copy of the surveillance video in September 25, 2013. On September 30, 2013, Warden Snedeker responded, "There is no surveillance video recording documentation. Facility recording equipment has a storage preservation capacity of one and half months (six (6) weeks)." Doc. 249-19 at 2.

---

[2] Ms. Tenorio refers to Amanda Martinez as Amanda Maldonado in her response to the County Defendants' Motion for Summary Judgment, which is her current name. *See* Doc. 249 at 4, ¶ 32. But because the depositions and other evidence refer to "Amanda Martinez," not "Maldonado," I will use the surname "Martinez."

## II.    Discussion

### A.  Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  "[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Celotex*, 477 U.S. at 324.  The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B. Ms. Tenorio's Motion for Partial Summary Judgment Against the Detention Officer Defendants

In her motion, Ms. Tenorio seeks summary judgment in her favor against defendants Sandoval, Romero, and Borrego on her claim in her sixth cause of action that these defendants violated her rights under the Fourth Amendment to be free from unreasonable seizure and the use of excessive force. Doc. 217 at 9–17. Ms. Tenorio argues that the undisputed facts show that Officers Sandoval and Romero seized Ms. Tenorio by handcuffing her without probable cause and with no legal justification, and that Officer Borrego had the opportunity to intervene and prevent the seizure. *See id.* She further argues that in handcuffing her, Officers Sandoval and Romero used excessive force, and that again, Officer Borrego had the opportunity to intervene and did not do so. *See id.* Ms. Tenorio also seeks summary judgment in her favor on her claims in her third cause of action that the Detention Officer Defendants assaulted, battered, and falsely imprisoned her, in violation of the New Mexico Tort Claims Act. *See id.* at 17–22.

In response, the officers argue that Ms. Tenorio is not entitled to summary judgment on any claim because there is a dispute of material fact as to whether Ms. Tenorio invited the Detention Officer Defendants to try to handcuff her and consented to being handcuffed. *See*

Doc. 236 at 20–23.  Because I agree that there is sufficient evidence to support the Detention

Officers' view that Ms. Tenorio invited them to handcuff her and consented to being handcuffed,

material facts are in dispute, and summary judgment is not appropriate.

The Tenth Circuit has identified three general categories of encounters between law

enforcement officers and citizens:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting *United States v. Torres-*

*Guevara*, 147 F.3d 1261, 1264 (10th Cir.1998)).  "[A] person has been 'seized' within the

meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that [s]he was not free to leave."  *United*

*States v. Mendenhall,* 446 U.S. 544, 554 (1980).  The critical inquiry is whether the officers'

"conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore

the police presence and go about [her] business."  *Florida v. Bostick,* 501 U.S. 429, 437 (1991)

(quotation omitted).

In determining whether an individual has been seized, the Tenth Circuit has instructed

courts to consider several factors, including:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . .; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

*United States v. Hill,* 199 F.3d 1143, 1147–48 (10th Cir.1999).  No single factor is dispositive,

nor is the list exhaustive.  *United States v. Rogers*, 556 F.3d 1130, 1138 (10th Cir. 2009).

Of course, most cases that examine whether encounters between law enforcement officers and private citizens are consensual do not involve individuals who know each other and work together regularly. They also rarely involve situations in which the law enforcement officers insist that the alleged "seizure" was done in fun, that the purported victim essentially invited the officers to try to "cuff her," and that they only were involved in "horseplay." Consequently, many of the factors listed in *Hill* do not seem particularly relevant here. However, both parties cite to the Tenth Circuit's decision in *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197 (10th Cir. 2006), which is instructive.

In *Fuerschbach*, the plaintiff was a Southwest Airlines employee who had just completed her probationary period. *Id.* at 1200–01. As was customary at Southwest, the plaintiff's coworkers decided to play a celebratory prank on the plaintiff to commemorate the end of her probationary period. *Id.* The prank they decided on was to have two Albuquerque Police Department officers go to the ticket counter where the plaintiff was working and inform her that during the course of performing her background check, they had found an outstanding warrant for her arrest. *Id.* at 1201. The officers then would perform a "mock" arrest. *Id.* The plaintiff's supervisor assured the officers that plaintiff would be okay with the prank. *Id.* In actuality, however, the plaintiff became upset and started crying during the course of the mock arrest, especially when the officers refused to respond when she asked if the arrest was a joke. *Id.* The officers handcuffed the plaintiff and led her toward an elevator, at which point one of her co-workers jumped out and congratulated her for being off probation. *Id.* Once plaintiff was released, she continued to cry, and later in the day she was sent home because she still was upset. *Id.* The plaintiff started seeing a psychologist because of the event, and the psychologist diagnosed the plaintiff as suffering from post-traumatic stress disorder. *Id.* at 1201–02.

The district court granted summary judgment to the officers and the City of Albuquerque. *Id.* at 1202. Although the district court found that the officers had violated the plaintiff's constitutional rights, the court found that her rights were not clearly established, and that the officers therefore were entitled to qualified immunity. *Id.* The district court also found that the City was not liable because there was no evidence that the City authorized or ratified the officers' actions. *Id.* The district court further found that the plaintiffs' state law claims for false imprisonment, false arrest, and assault and battery were without merit, and it granted summary judgment to the officers on these claims. *Id.* at 1202, 1207.

The court of appeals reversed. The court held that the plaintiff's allegations, if true, established that she was seized under the Fourth Amendment. *Id.* at 1202. The court noted that "[a] seizure occurs for Fourth Amendment purposes when 'a reasonable person would have believed that he [or she] was not free to leave.'" *Id.* at 1202–03 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988)). The court then examined the *Hill* factors and held that if the allegations in the plaintiff's complaint were true, a reasonable person would not have felt free to terminate the encounter. *Id.* at 1203. But the court also noted that given the unique circumstances of the encounter—that the seizure arose in the context of a workplace prank— evidence presented at trial could lead the jury to conclude that a reasonable person would have felt free to leave. *Id.* In other words, there was a disputed issue of material fact that would prevent the court from granting summary judgment to either party. *Id.*

The same is true in this case. Although Ms. Tenorio argues that "[t]here is no separate 'consent' defense in Fourth Amendment law," Doc. 243 at 3, this ignores the basic premise that "consensual encounters . . . do not implicate the Fourth Amendment," *Lopez*, 443 F.3d at 1283. The *Hill* factors are factors that the court considers in determining whether valid consent was

obtained, but as the Tenth Circuit repeatedly has noted, no single factor is dispositive, nor is the list exhaustive. Thus, although Ms. Tenorio characterizes her encounter with the officers as nonconsensual and notes that the undisputed facts satisfy several of the *Hill* factors, *see* Doc. 217 at 11–12, the officers' testimony could lead a jury to conclude that a reasonable person would have felt free to leave. For example, Officer Sandoval testified that Ms. Tenorio asked him to handcuff her several times, but he refused. Doc. 236-3 at 6. According to Officer Sandoval, Ms. Tenorio kept "egging" him on, and he finally agreed to try to "cuff" her. *Id.* He further testified that she was stronger than he, that she resisted and threw him into the bathroom door, and that she then began teasing him and telling him that he was weak. *See id.* at 5–6. He said she was laughing the entire time, and that once he was able to cuff her and they stopped scuffling, he uncuffed her. *See id.* at 6, 8. Officer Romero testified that he and Ms. Tenorio "began horseplaying with [his] cuffs," and that the encounter was "two friends just horseplaying." Doc. 236-4 at 3, 4. He said Ms. Tenorio was "laughing the whole time" as she was trying to keep her wrists away from him. *Id.* at 5. He believed that "[s]he uncuffed herself," with a cuff key, after he succeeded in cuffing her. *Id.* at 6. After the incident, Officer Romero had to "nudge" her out of the control room so that he and Officer Sandoval could "conduct the count." *Id.* at 7.

Officer Borrego testified that he heard Officers Sandoval and Romero say that they were going to try to cuff Ms. Tenorio. Doc. 236-5 at 3. He said Ms. Tenorio was "taunting the officers and laughing with them," and that it seemed like horseplay to him. *Id.* at 4. When Ms. Tenorio was handcuffed to the chair, he did not give his cuff key to her because Ms. Tenorio "was laughing and taunting the other officers," and he knew that she could ask one of the other officers for a cuff key if she wanted to be uncuffed. *Id.* at 5. Officer Borrego left the control room, and when he came back, she was handcuffed to the toilet. *Id.* He then gave her his cuff

key because it looked like "it was hurting her." *Id.* She then uncuffed herself, and Officer

Borrego stood there while Ms. Tenorio and Officers Sandoval and Romero stood nearby. *Id.*

According to Officer Borrego, "all three of them"—Ms. Tenorio and the two officers—"were

laughing about cuffing her." *Id.*

These facts and an examination of the *Hill* factors do not undisputedly lead to the

conclusion that a reasonable person would not have felt free to leave. Although up to three

officers were present during the handcuffing, there is significant evidence that their presence was

not "threatening" in any way, and that the atmosphere was friendly and joking. There is no

evidence that any officer brandished a weapon. Although there unquestionably was physical

touching, the officers testified that Ms. Tenorio asked them to try to cuff her. There is no

evidence that any officer used aggressive language or indicated that Ms. Tenorio was required to

comply with any officer's request or command. There also is no evidence that any officer

retained possession of any of Ms. Tenorio's possessions. In addition, there is no indication that

any officer asked Ms. Tenorio to go anywhere. And although the interaction took place in a

nonpublic place, and no other members of the public were present,[3] the door was not closed, and

the encounter was in a space that Ms. Tenorio entered voluntarily and had to be "nudged" out of

after the entire incident. Viewing the evidence in the light most favorable to the officers, a

reasonable jury could conclude that the entire encounter was consensual and did not implicate

the Fourth Amendment. Ms. Tenorio is not entitled to summary judgment on her Fourth

Amendment claim against the Detention Officer Defendants in her sixth cause of action.

---

[3] A female detention officer entered the control room at one point, but Ms. Tenorio testified that she did not ask her for help because "it seemed to me like she was in with the guys." Doc. 236-2 at 8.

Ms. Tenorio likewise is not entitled to summary judgment on her third cause of action against the Detention Officer Defendants for assault, battery, and false imprisonment. "Under New Mexico law, '[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" *Romero v. Sanchez*, 1995-NMSC-028, ¶ 13, 119 N.M. 690, 693, 895 P.2d 212, 215 (quoting N.M. STAT. ANN. § 30-4-3). As explained above, there is a material dispute of fact as to whether Ms. Tenorio consented to being handcuffed, which precludes the entry of summary judgment on the false imprisonment claim.

"An assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery,'" *id.* ¶ 12, 119 N.M. at 693, 895 P.2d at 215 (quoting N.M. STAT. ANN. § 30-3-1(B)), or "an attempt to commit a battery," N.M. STAT. ANN. § 30-3-1(A). Battery occurs when an individual "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly or indirectly results." *State v. Ortega,* 1992-NMCA-003, ¶ 12, 113 N.M. 437, 440, 827 P.2d 152, 155 (citing RESTATEMENT (SECOND) TORTS § 18 (1965)). The key in this case is whether there was a "threat or menacing conduct," or instead whether Ms. Tenorio invited the officers to attempt to handcuff her. Also, whether the contact was "offensive" depends on whether Ms. Tenorio invited and consented to the contact, or whether that contact was unwanted. Viewing the evidence in the light most favorable to the Detention Officer Defendants, a reasonable jury could find in their favor. The Court therefore will deny Ms. Tenorio's motion for summary judgment against the Detention Officer Defendants in its entirety.

**C. County Defendants' Motion for Summary Judgment on Ms. Tenorio's Constructive Discharge and Discrimination Claims (First, Second, and Fifth Causes of Action)**

The County Defendants argue that Ms. Tenorio's first, second, and fifth causes of action fail because there are insufficient facts for any reasonable jury to find that any of the County Defendants were Ms. Tenorio's employer. *See* Doc. 231 at 9–13. Ms. Tenorio argues that there are genuine issues of material fact as to whether any of the County Defendants, along with HCP, was her employer, and that therefore summary judgment is precluded. Doc. 249 at 13–17. I agree that Ms. Tenorio must prove that the County Defendants, or at least one of them, was Ms. Tenorio's employer to prevail on these three claims. I further agree that even when viewing the facts in the light most favorable to Ms. Tenorio, no reasonable jury could find that any of the County Defendants was Ms. Tenorio's employer. I therefore grant summary judgment in favor of the County Defendants on Ms. Tenorio's first, second and fifth causes of action.

In Ms. Tenorio's first cause of action, she alleges that Warden Snedeker, SMCDC, and the County constructively discharged her from her employment. Doc. 128 at 14. To prove a claim of constructive discharge under New Mexico law, an employee/plaintiff must prove "facts sufficient to find that the *employer* made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign." *Gormley v. Coca-Cola Enterprises*, 2005-NMSC-003, ¶ 10, 137 N.M. 192, 194–95, 109 P.3d 280, 282–83 (emphasis added). In her second cause of action, Ms. Tenorio alleges that Warden Snedeker, SMCDC, and the County engaged in unlawful discriminatory practices under the New Mexico Human Right Act. Doc. 128 at 15. The New Mexico Human Rights Act makes it an unlawful discriminatory practice for "an *employer*, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in

matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of . . . sex . . . ." N.M. STAT. ANN. § 28-1-7(A) (emphasis added). An "employer" is "any person employing four or more persons and any person acting for an employer." N.M. STAT. ANN. § 28-1-2(B). In her fifth cause of action, Ms. Tenorio alleges that Warden Snedeker, SMCDC, and the County discriminated against her based on sex under Title VII of the Civil Rights Act of 1964. Doc. 128 at 18. Title VII makes it unlawful for an "*employer*" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on account of sex. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). Thus, the County Defendants are correct that Ms. Tenorio cannot prevail on her first, second, or fifth causes of action[4] unless there are sufficient facts to establish that the County Defendants, or at least one of them, was her employer.

The parties agree that the Tenth Circuit's "joint-employer test" is the appropriate legal framework to determine whether a reasonable jury could find that any of the County Defendants were Ms. Tenorio's employer. *See* Doc. 231 at 9–13; Doc. 249 at 14–17. Under the joint-employer test, two independent entities are considered joint employers if they "share or co-determine those matters governing the essential terms and conditions of employment." *Bristol v. Board of County Com'rs of County of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) (*en banc*) (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994)) (internal quotations omitted). If both entities "exercise significant control over the same

---

[4] Ms. Tenorio also names HCP and Rita Torres in these causes of action, but she has settled her claims against these parties. *See* Doc. 229.

employees," both entities may be held liable as employers. *See id.* (internal citations and quotations omitted). Whether an entity may terminate the employment relationship may be the most important factor in determining whether the entity has sufficient control over the terms and conditions of an employee's employment. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1228 (10th Cir. 2014). Courts also should consider whether the entity has the ability to "promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; day-to-day supervision of employees, including employee discipline; and control of employee records, including payroll, insurance, taxes and the like." *Id.* at 1226 (internal citation, quotation marks, and ellipses omitted). Usually the determination of whether an entity is an employer is a factual issue for the jury to decide unless there is no "legally sufficient evidentiary basis for a reasonable jury to find" an employer/employee relationship. *See Bristol*, 312 F.3d at 1221.

The *Knitter* case is similar to this case and controls the outcome here. In *Knitter*, the plaintiff worked as a handyman for a contractor. *Knitter*, 758 F.3d at 1217. The contractor's sole client was a property management company that managed housing on several military bases. *Id*. at 1219. The plaintiff performed services exclusively for the property management company at a military base in Fort Riley, Kansas. *Id.* The plaintiff brought suit under Title VII for wage discrimination and sexual harassment, as well as retaliation based on her assertion she was fired for complaining about discrimination. *Id.* Pursuant to the contract between the contractor and the property management company, the property management company could and did request that the contractor no longer assign plaintiff to work at the Fort Riley military base. *Id*. at 1229. Because the contractor had no work other than at Fort Riley, the contractor terminated plaintiff's employment. *Id.* at 1223. The property management company paid the contractor a flat fee for

handyman services, and the contractor then paid the plaintiff for her services. *Id.* at 1229. And although the property management company told plaintiff what jobs needed to be done and made sure that the jobs were done according to the management company's specifications, it did not train the plaintiff or provide her with formal performance evaluations as it did for its own employees. *Id.* at 1230. In addition, although the property management company could complain about plaintiff's performance to the contractor, the property management company did not have the authority to discipline the plaintiff. *Id.* at 1231.

Applying the joint-employer test to these facts, the *Knitter* court concluded that the property management company exerted insufficient control over the authority to terminate, pay, supervise and discipline the plaintiff to be her joint employer. *Id.* The court determined that the relationship between the plaintiff and the property management company was consistent with a client-vendor relationship, not an employer-employee relationship. *Id*. at 1230. The court held that the plaintiff "has not offered sufficient facts for a reasonable jury to find [the property management company] was her joint employer rather than a client of [the contractor]." *Id*. at 1231.

As was true in *Knitter*, the facts in this case demonstrate under the joint employer test that (1) none of the County Defendants had the authority to terminate Ms. Tenorio's employment; (2) HCP had exclusive control over Ms. Tenorio's pay and benefits; and (3) none of the County Defendants had the authority to supervise or discipline Ms. Tenorio beyond the confines of the County's contract with HCP. No reasonable jury could find that any County Defendant was Ms. Tenorio's joint employer.

First, and most importantly, it is undisputed that Ms. Tenorio continued to work for HCP at a jail in Trinidad, Colorado, after she stopped working at the SMCDC location. Doc. 231-2 at

16, 32; Doc. 231-3 at 5. Thus, even if Warden Snedeker complained about Ms. Tenorio to HCP, or told HCP that he didn't want her working at SMCDC any more, he did not have the authority to terminate her employment at HCP. Indeed, the contract between San Miguel County and HCP gave the County "absolute authority to deny access to the facility of any person who in the opinion of the County poses a risk to the security of the Detention Facility," Doc. 249-10 at 6, but it did not give the County the authority to terminate or discipline an HCP staff person, *see generally* Doc. 249-10; *see also* Doc. 249-7 at 5 (Warden Snedeker testified he could control who was working in his facility as "specified in the contract," but "I would not discipline a Healthcare Partners—any of their personnel."). The contract Ms. Tenorio signed when she started working at SMCDC, on the other hand, gave HCP the right to terminate Ms. Tenorio's employment. Doc. 231-4 at 5.

Second, it also is undisputed that HCP had exclusive control over Ms. Tenorio's pay and benefits. HCP had a contract with San Miguel County to provide appropriate medical treatment to the prisoners housed at SMCDC. *See* Doc. 249-10. The contract between HCP and the County required HCP "provide all staffing necessary to discharge its duties and responsibilities under the agreement," and assigned to HCP sole responsibility for paying the employees and independent contractors that HCP used to fulfill its obligations. Doc. 249-10 at 3. The County paid HCP a flat rate, subject to specified exceptions, for its services under the contract. Doc. 249-10 at 4. Ms. Tenorio submitted her timesheets to HCP, Doc. 231-2 at 10–11, and HCP paid Ms. Tenorio based on the hours she worked at any detention center, Doc. 231-4 at 2; Doc. 231-5. She received no other benefits from either HCP or SMCDC.[5] Doc. 231-2 at 10. An HCP employee set Ms. Tenorio's schedule and scheduled her to work at SMCDC on an as needed

---

[5] HCP paid for Ms. Tenorio's gas and arranged for a place for her to stay when she was assigned to the Trinidad location. Doc. 231-2 at 32.

basis.  Doc. 231-2 at 12.

Third, it is further undisputed that in general, only HCP had supervisory and disciplinary authority over Ms. Tenorio.  An HCP employee was Ms. Tenorio's direct supervisor.  Doc. 231-2 at 13.  HCP employees told Ms. Tenorio what to do on a daily basis while she was working at SMCDC.  *Id.*  Only occasionally, if there was a conflict between what the SMCDC administration was doing and what the medical officers were doing, Ms. Tenorio would have to take direction from SMCDC administration.  *Id.*  For example, "if they [SMCDC administration] told me I had to wait for med line, I had to wait for med line. . . .  something simple like that." *Id.*  There was a medical office at SMCDC that only HCP employees had a key to.  Doc. 231-2 at 14.  Although the County paid for the "supplies and equipment necessary for the delivery of medical services to inmates," and also provided all the "equipment, examination rooms, treatment rooms and office and storage space" HCP needed to fulfill its obligations, HCP developed and managed all on-site medical staffing as well as numerous other medical services listed in the contract.  Doc. 249-10 at 1–3.  An HCP employee provided on-the-job training to Ms. Tenorio to show her how to perform the various medical tasks she was responsible for, as well as how to enter data into the computer program the HCP staff used.  Doc. 231-2 at 14.  Under HCP's contract with the County, the County provided "on site training for HCP staff specific to security and Detention Facility policies and procedures," Doc. 249-10 at 6, but did not provide any training with respect to the medical tasks and data input that Ms. Tenorio was required to perform, Doc. 231-2 at 14.

After the handcuffing incident, only SMCDC conducted an investigation.  *See* Doc. 217-10; Doc. 249-11 at 2–4.  On June 10, 2103, Major Antonio Padilla submitted his investigation report to Warden Snedeker.  Doc. 217-10.  The investigation report concluded that "Medical

Officer Estrella Tenorio did initiate and willingly participated in wrestling, pushing and/or roughhousing to include handcuffing by Detention Sargent Elfigo Sandoval and Detention Officer Joey Romero in Master Control, which is a security post at the San Miguel County Detention Center." Doc. 217-10 at 7. On June 28, 2013, Warden Snedeker formally disciplined Detention Officer Borrego. Doc. 249-12. On July 10, 2013, he formally disciplined Detention Officer Romero. Doc. 249-14. On July 17, 2013, he formally disciplined Detention Sargent Sandoval. Doc. 249-16 at 2–3.

There is no evidence of any similar discipline of Ms. Tenorio. Ms. Tenorio last worked at SMCDC on July 8, 2013. Doc. 249-13. Ms. Tenorio testified that her supervisor told her that she was taken off the schedule at SMCDC at the direction of Rita Torres (an HCP employee) and Warden Snedeker, "[b]ecause of the incident that happened." Doc. 249-6 at 8. Although the County Defendants argue that this testimony is inadmissible hearsay, *see* Doc. 254 at 9, even if I accept it as true, it is insufficient to show that Warden Snedeker had the authority to discipline Ms. Tenorio. In *Knitter*, it was undisputed that the property management company asked that the contractor not assign the plaintiff to work at Fort Riley because the plaintiff was untimely, uncooperative, and billed for work she did not do. *Knitter*, 758 F.3d at 1223. The contractor complied with this request, and because the contractor had no other work other than work at Fort Riley, the contractor fired the plaintiff. *Id.* The Tenth Circuit held that this was insufficient to show that the property management company had the authority to terminate or discipline the plaintiff. *Id.* at 1229, 1231. The facts in this case lead to the same result. Although the contract with HCP gave Warden Snedeker control over who entered the facility, Doc. 249-10 at 6, and he could tell HCP that an individual was no longer permitted to work at SMCDC, Doc. 249-7 at 5, Warden Snedeker could neither fire nor discipline Ms. Tenorio, *see id.*; Doc. 249-10 at 3; *see*

*also* Doc. 231-2 at 9; Doc. 231-4. Ms. Tenorio last worked at SMCDC on July 8, 2013, but she continued to work for HCP after that date, and she also received a small raise. *See* Doc. 231-2 at 16, 32.

Based on the forgoing undisputed facts, no reasonable jury could find that any of the County Defendants were Ms. Tenorio's employer. The County Defendants are entitled to summary judgment in their favor on the First, Second, and Fifth Causes of Action in Ms. Tenorio's First Amended Complaint.

### D. County Defendants' Motion for Partial Summary Judgment on Ms. Tenorio's Constitutional Claims (Sixth Cause of Action)[6]

The County Defendants argue that Ms. Tenorio's Equal Protection claim and her First Amendment claim contained in her sixth cause of action also fail because she cannot prove that she was an employee of any of the County Defendants. Doc. 231 at 13. They also argue that there is insufficient evidence to support Ms. Tenorio's denial-of-access-to-the-courts claim, and that even if Ms. Tenorio could show a constitutional violation, Warden Snedeker and Major Padilla would be entitled to qualified immunity. *Id.* at 18–20. Finally, the County Defendants argue that there is no evidence to show that either Warden Snedeker or Major Padilla were personally involved or causally linked to the handcuffing incident, and that therefore Ms. Tenorio's Fourth Amendment claims against these two individual defendants must fail. *Id.* at 20–22.

In response, Ms. Tenorio argues that there is sufficient evidence for the jury to find that the County Defendants were her employer, and that they violated her Equal Protection rights and First Amendment rights by firing her. Doc. 249 at 23–27. With respect to her denial-of-access-

---

[6] The County Defendants also moved for summary judgment on Ms. Tenorio's spoliation claim (fourth cause of action), Doc. 231 at 22–23, but the Court already has dismissed this claim, Doc. 250.

to-the-courts claim, she argues that there is sufficient circumstantial evidence for a reasonable jury to find that the County Defendants intentionally destroyed the video, which would have been material evidence in this case. *Id.* at 29–32. She also argues that the law was clearly established, and that therefore Warden Snedeker and Major Padilla would not be entitled to qualified immunity on this claim. *Id.* at 28–29. Finally, with respect to her Fourth Amendment claims, Ms. Tenorio agrees that those claims—as stated in paragraphs 114 and 115 of her first amended complaint, Doc. 128 ¶¶ 115, 155—are not against Warden Snedeker and Major Padilla. Doc. 249 at 32. For the following reasons, I agree that the County Defendants are entitled to summary judgment in their favor on Ms. Tenorio's Equal Protection claim, her First Amendment retaliation claim, and her denial-of-access-to-the-courts claim.

### 1. Equal Protection Claim

The parties agree that Ms. Tenorio's Equal Protection claims contain the same elements as her Title VII claims. Doc. 231 at 13; Doc. 249 at 23; *see also Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006) ("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." (quotations and alterations omitted)), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006). Because one of those elements requires that Ms. Tenorio prove that at least one of the County Defendants was her employer, *see infra* at 14–15, and because the Court already has found that no reasonable jury could find that any of the County Defendants were her employer, the County Defendants are entitled to summary judgment on the Equal Protection claim in paragraph 111 of Ms. Tenorio's first amended complaint. *See* Doc. 128 ¶ 111.

### 2. First Amendment Retaliation Claim

Ms. Tenorio's First Amendment retaliation claim rests on the premise that she was a government employee, and that she was terminated from her employment because she spoke out about a matter of public concern. *See* Doc. 249 at 24–27. Again, because the Court already has found that no reasonable jury could find that Ms. Tenorio was a San Miguel County employee, her First Amendment retaliation claim must fail. The County Defendants are entitled to summary judgment on Ms. Tenorio's First Amendment retaliation claim in paragraph 112 of the first amended complaint. *See* Doc. 128 ¶ 112.

### 3. Denial-of-Access-to-the-Courts Claim

Ms. Tenorio has brought a "backward looking" denial-of-access-to-the-courts claim against the County Defendants. Doc. 249 at 28. She alleges that Warden Snedeker and Major Padilla violated her right of access to the courts by destroying or otherwise denying her access to the videotape of the area outside the control room, which purportedly would have shown a portion of the handcuffing incident. *See* Doc. 128 ¶ 113; Doc. 249 at 28–32. To prove a "backward looking" denial-of-access claim, a plaintiff must prove that an official act frustrated the plaintiff's ability to bring a "nonfrivolous" or "arguable" claim and caused the plaintiff to suffer a loss. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The complaint must identify the underlying claim that was frustrated, as well as the remedy. *Id*. The Tenth Circuit has recognized that the "intentional, bad-faith destruction or concealment of evidence that burdens a plaintiff's ability to access the courts" could support an unconstitutional denial-of-access claim. *Donohue v. Hoey*, 109 F. App'x 340, 357 (10th Cir. 2004) (unpublished). The County Defendants argue that there is insufficient evidence for a reasonable jury to find that either Warden Snedeker or Major Padilla intentionally and in bad faith destroyed or concealed

the videotape.  Doc. 231 at 19.  They further argue that there is insufficient evidence that the videotape contained material evidence.  *Id.*  I agree on both counts.

Ms. Tenorio argues that viewing the evidence in the light most favorable to her, a reasonable jury could infer that Warden Snedeker and Major Padilla intentionally destroyed or concealed the videotape.  Both Warden Snedeker and Major Padilla testified that they never saw the video tape.  Doc. 231-1 at 4; Doc. 231-9 at 2.  Major Padilla testified that he checked the video system as part of his investigation into the handcuffing incident, but he did not find anything.  Doc. 231-9 at 3.  Major Padilla thought the video system preserved videos for seven to fourteen days, Doc. 249-3 at 6, while Warden Snedeker thought it was four to six weeks, Doc. 249-7 at 6.  The only evidence that either Warden Snedeker or Major Padilla ever even accessed the video was Ms. Tenorio's testimony that Amanda Martinez, her supervisor at HCP, told her that "she saw a video with the warden and major."  Doc. 249-6 at 10.  Ms. Tenorio testified that Ms. Martinez said that the video showed "[Ms. Tenorio] eventually roll out into the hall cuffed to a chair."  *Id.*  She also testified that Ms. Martinez did not say anything else about what was shown on the video.  *Id.*; *see also* Doc. 231-2 at 30.  Ms. Tenorio thought that the video "would have showed that I was looking up to the camera, you know, trying to see if anybody would see me," but she acknowledged that she had never seen the video.  Doc. 231-2 at 30; Doc. 249-6 at 10.

First, the only evidence that the Warden Snedeker and Major Padilla actually accessed the videotape is inadmissible hearsay.  *See* FED. R. EVID. 801, 802, 803.  Ms. Tenorio testified that Ms. Martinez told her that she (Ms. Martinez) watched the video with the warden and major, but Ms. Tenorio has made no effort to show that the substance of this evidence could be presented in an admissible form at trial.  *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir.

2016) (in determining whether there are genuine issues of material fact, court may only consider admissible evidence; burden is on the proponent of the evidence to explain how substance of evidence would be admissible at trial). Obviously, Ms. Martinez herself could testify at trial, but there is no affidavit or other indication in the record that Ms. Martinez's testimony would be consistent with Ms. Tenorio's recollection of her conversation with Ms. Martinez. *See id.* Thus, because there is no admissible evidence that Warden Snedeker or Major Padilla ever saw or possessed the videotape, no reasonable jury could infer that they intentionally and in bad faith destroyed that videotape. *See Donohue*, 109 F. App'x at 357–58 ("[T]he lone fact that the missing evidence would have incriminated the defendants does not support an inference that the defendants intentionally destroyed the evidence.").

Second, the only evidence regarding what was on the videotape likewise is inadmissible hearsay. Again, Ms. Tenorio testified that Ms. Martinez told her that the videotape showed Ms. Tenorio handcuffed to a chair. Doc. 249-6 at 10. Ms. Tenorio has made no effort to demonstrate that the substance of this evidence could be presented at trial in an admissible form. Moreover, as the County Defendants point out, the fact that Ms. Tenorio was handcuffed to a chair is not disputed, and the fact that Ms. Tenorio does not have a videotape of this event has not frustrated her ability to bring her claim. Although Ms. Tenorio surmises that the videotape would have shown her looking at the camera, she admitted that she never saw the videotape. Thus, her testimony is pure speculation. Likewise, Ms. Tenorio's assertion that the videotape would have shown other events in the hallway is pure speculation. *See* Doc. 249 at 31. Although there is evidence that the hallway area typically is under video surveillance, there is no admissible evidence to show what actually was captured on the video that evening, if anything, and whether the video ever was accessed by either Warden Snedeker or Major Padilla. The fact that the video

might have had incriminating evidence on it does not support the inference that the video was intentionally destroyed or concealed, or that Warden Snedeker and/or Major Padilla were the ones that did it. Warden Snedeker and Major Padilla therefore are entitled to summary judgment on Ms. Tenorio's denial-of-access-to-the-courts claim in paragraph 113 of the first amended complaint. *See* Doc. 128 ¶ 113.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the Court DENIES plaintiff Estrella Tenorio's Partial Motion for Summary Judgment against Defendants Sandoval, Romero, and Borrego for Violations of Plaintiff's Fourth Amendment Rights and for Torts Under the New Mexico Tort Claims Act (Doc. 217). Further, the Court GRANTS the County Defendants' Motion for Summary Judgment on Qualified Immunity and Other Grounds (Doc. 231). Specifically,

1. Summary Judgment is GRANTED in favor of the County Defendants on the First, Second, and Fifth Causes of Action in Ms. Tenorio's First Amended Complaint;

2. Summary Judgment is GRANTED in favor of the County Defendants on Ms. Tenorio's Equal Protection claim, First Amendment Retaliation claim, and Denial-of-Right-of-Access-to-the-Courts claim as asserted in paragraphs 111, 112, and 113 of the Sixth Cause of Action in Ms. Tenorio's First Amended Complaint;

3. The County Defendants' Motion for Summary Judgment on the Fourth Cause of Action in Ms. Tenorio's First Amended Complaint is MOOT as the Court already has dismissed that claim. *See* Doc. 250.

**IT IS SO ORDERED.**

_____
Laura Fashing
United States Magistrate Judge